It please the court. My name is Patricia Rose. I'm here on behalf of Donald Loen, who is the appellant here, as well as the plaintiff below. Before we proceed further, I would like to reserve five minutes, if possible, to respond to the county's argument. You've got your clock, but I'll also try to help you and watch. I appreciate that. Before we address the merits, I think what I'd like to do initially is renew the motion for certification of the issues in this appeal to the state Supreme Court. They are very unique. They are issues of first impression under Washington law. Both parties, as well as the court below, conceded that there was no Washington law directly on the issues presented in this case. In the context of this case, they involve, obviously, construction of a very new immunity statute for provision of references. Most particularly, they involve the whole doctrine of consent in the common law of defamation, particularly in this context, but I've been unable to find any real meaningful discussion about consent generally in the Washington common law of defamation. Counsel, with respect to that point, Washington has adopted the restatement approach to defenses to defamation, has it not? Yes, it has, generally. Under the circumstances, are we not in a reasonably decent position, particularly given Washington's strong desire not to have these things referred to it by us, to evaluate what it might do if that issue is key in this case? Yeah, I don't doubt that you're in a position to apply the restatements. I think it's because of the policy issues raised here that have a broad impact for employees in various settings, in addition to law enforcement, that this case is unique in the way it will be interpreted, as well as the consequences of it. And so, because not only are the issues of first impression, they also raise major policy issues for employee-employer relationships, generally, as well as the law enforcement context. You make a good point, and obviously, when we sit down and consider it, we always look on issues like this, whether or not to certify, but as you know, there's a whole bevy of circumstances as to whether or not things are appropriate for certification, but we'll definitely take that into account. And I understand that it's only done in compelling circumstances, and it's clearly within your discretion, and I just want to make clear that it was raised below, and it has been renewed as of May 2014 in a separate motion, which was reserved to the panel. Did you raise this issue with the district court? It was raised to the district court on a motion for reconsideration. On reconsideration, but not initially, though. Not initially, though, the issue of it being an issue of, you know, first impression was clearly raised by both parties in the primary briefing before the district courts. So, I'd like to turn to, frankly, there are a number of issues in this case, and I'd happily take any questions the court has on any of those issues, but I'd like to at least start by the premise that the statements made by Susanna Johnson in this case are capable of defamatory meaning, and that there's already an assumption that there's a prima facie case of defamation here before turning to the whole issues of consent and privilege, which obviously would defeat a finding of defamation here. There's no dispute, I think, in this case that there was obviously a publication. There's no dispute that the damages flowed from the communication. The only issue that there may arguably be an issue of fact for a jury to consider is whether the statements were provably false or not, and the definition as... Or if your client gave consent and therefore obviated any claim. Certainly, that's a defense, but in terms of the actual elements, the prima facie elements, that whether they're false or not. I realize you're starting with the substantive question, so where in the record would we look to show that somehow the county body passed them but said otherwise with respect to the polygraph, and where is the foundation for the malice? Well, the situation is unique here. Unlike, you know, many of the cases that have been said, I first want to emphasize that the county was not in a privileged capacity because they were not a former employer, and so there's a whole issue of first impression as to whether a third party or a prospective employer can even comment on a person's... Especially in the scope of these specific releases, but also under the common law, whether the consent doctrine or qualified privilege applies in that context. But in terms of... The issue in this case, in terms of malice, is a standard of actual malice and reckless disregard, and whether there are genuine issues of fact as to that issue. And in this case, the unique context of this case is twofold. One is that while these communications were occurring, there was clearly a civil service hearing happening that was contesting the very factual basis for that statement. She was well aware, she was sitting in the room where these civil service hearings were happening, and she had heard from the key decision maker on the city of Snohomish selection process that had he not passed the polygraph examination there, he never would have been hired. And obviously, she was aware because she worked for Snohomish County that there was a contest and factual disputes as to whether he had indeed passed the polygraph at Snohomish County. It was represented to him that he had by the polygraph examiner. It was represented to him that he had successfully completed the background examination in the presence of his wife. He completed the successive requirements. But perhaps I recall the record incorrectly, but I thought that the person who took the polygraph test indicated that there was a problem, and perhaps that your client had, prior to the time that it was taken, indicated that he'd had some problem with a polygraph exam before. Do I have a bad recollection on that? There is testimony from the polygraph examiner, but that's disputed by my client. What there is clear, undisputed facts is that during the course of the polygraph examination, when the questions were raised very generally about, as I understand it, about drug use or drug sales, he paused and there was a physiological reaction. And at the point in which that exam was concluded, he initiated the discussion and said, I'm beginning to have some recollection of an event that happened, you know, 25 years ago. And then asked, you know, to, and she said they could re-examine on that issue. And then he subsequently passed on that on another day. So he disclosed that he had maybe spent $10 or received $10 from a peer when he was 16 or 18. And because he was not intentionally deceptive on that issue, and that's the conclusion of the ultimate polygraph examination, he moved to the next stages of the examination process. And from his perspective, successfully cleared those and was clearly meeting the qualifications for the position. But the real issue here is... It's a little messy, factually. So I think that it would be helpful because we, I think these legal questions could be dispositive with respect to his waiver. Right. And I'd like to focus on that. Yes. And I'm about to. So thank you for the direction. First, there is common law in Washington about waiver in the release context. And none of those cases are really relevant to this discussion. Obviously, 90% of waiver in release context have happened in the context of recreational sports or other kinds of, you know, actions where an individual clearly assumes the risk of future injury by scuba diving or by skiing in an off-track area or various other situations. And those are the cases that are cited for waiver of a right in this case. And I'll get to consent in about a minute, even though I realize the time is running here, because I think that's a slightly different issue, obviously, than waiver. But waiver clearly, you know, under the standards of Washington has to be acting, you know, intentionally and involuntarily relinquish and to permanently surrender that right. And all of Lowen's actions can be looked at in the context of this particular employment setting that he intended for third parties, not prospective employers, but third parties with specific personal knowledge of him to be able to provide information to the city of Ellensburg and Kittitas and the actions subsequently when he learned of the statements that were controverted was to withdraw any consent or and not clearly to indicate that he had not waived any of those rights through correspondence from me. I understand the facts correctly, counsel. There are two different employment possibilities where this information was released, is that correct? Correct. City of Ellensburg and Kittitas. Different forms, and if I understood it correctly, he knew that a release of this information was required for the possibility of employment in both these different jurisdictions, right? Well, I think the nuance here is that he knew that information about his employment history would be released in the specific... You're saying he did not realize that the polygraph information would be mentioned polygraph information? I agree that this Kittitas County does reference polygraph examinations, but again, it's directed if you read the specific language of the releases, it clearly indicates that with the city of Ellensburg, the languages that he's authorizing, I'm sorry, authorizing communications regarding his work record and... No, it actually says, if you back up a little, it actually says any and all information that you have concerning me, including, and then it goes on to all those things, without limitation, work, background, etc. But the county is relying on the fact that he consented to having investigatory records revealed about him, and it's clear in Ellensburg, at least, that that language about investigative records is limited to criminal history records. Is the basis of your client's claim that it felt that he had successfully passed it, he had not lied, and therefore that was the problem that the underlying information was incorrect? He thought that it had been correctly reflected when he asked, when he gave this permission to be released? Right, and he, you know, and because the county had indicated that he had been let go for not meeting, or sorry, not picked up in this selection process for not meeting the minimum qualifications, and in an email to me, which I think is part of the record, indicated that he was intentionally deceptive. He was taking issue with those facts, and the fact that that was occurring at the time that these communications were being made. Can we go back to the release language? It kind of has two bookends. It starts with any information you have concerning me, comma, and then da-da-da-da-da. And I agree in there that with respect to investigatory files, although it's included but not limited to, that does hinge on the criminal history, but then it has kind of a zipper effect at the end where it says, and such other information and records as you may have in your possession relating to me. So, it's about as broad as it could be to provide a release of information, and tell me what's wrong with that legally. Well, what's wrong with it legally is that, though it's addressed to whom it may concern, you would expect that Snohomish County was not in the scope of that release because of the circumstances that they were no longer, he was not, you know, an actual employee of theirs, that he was simply a candidate that's, you know, akin to, you know, allowing, you know, unfettered, you know, statements. Well, but this would, would this permit, for example, would this permit the medical record release or would there need to be something else? No, I think, you know, it's explicitly, at least in the city of Ellensburg, states medical records are included, and it also states medical records in the specific context. But the medical records don't relate to your prior employee. I mean, in other words, you don't have to be employed by somebody to have the doctor turn over your medical record. So I'm trying to figure out why it's linked necessarily to employment, because a medical person is a third-party provider or a third-party source of information. Yeah, he's not disputing that they were unable to obtain information from third parties, including credit history and personal characters. He's just indicating that by his consent, he's authorizing truthful communications from those people and accurate communications, and he's indicating that... Where does that come from? He doesn't use the word truthful in here. Well, again, this is one of the concerns of Mr. Lowen, is obviously these are, you know, boilerplate authorizations that he signed as a condition of being considered for employment, and law enforcement failed. He'd signed them numerous times before, and he had never had a history or experience where a prospective employer went to another prospective employer and sought information from them. But there's just nothing that limits that. I mean, I understand he would like it to be that way, but I just was having trouble finding a ground for limiting it to that. Well, with respect to the Kittitas County, I think there's clear factual evidence that if there was any consent given, he then withdrew it, and he hadn't even given the consent filed in the statements were made. So he hadn't even consented to that, and obviously having correspondence from me to counsel indicating that he was withdrawing any consent or indicating that they were only authorized to make communications required by law clearly obviated any subsequent release that he was basically signing, which was just a routine piece of business as a condition of his... Give me the timing sequence so that he signs the release, then... And I think I'm running out of time, so I was hoping... I'll give you a little extra, because I'm trying to understand it. Sure. So he signs this release with Kittitas County, and then Lieutenant Johnson gets it, and they give him access to the file, correct? Right, but the timing is that that occurred after he had already disclosed to Snohomish County, and an exercise of any reasonable care would be to say, you know, I'm not authorized to provide any information to you based on a subsequent document or a prior existing document. When had he provided to Snohomish County at that point? He had provided the correspondence from me on March 16th, and the second release was signed, I believe, on April 6th, as part of, you know, just getting a conditional offer of employment. I just have one quick question. In the Augsburg consent release of information, he says on the second, third paragraph of the first, second sentence of the first paragraph, I have authorized the department to gather all available information regarding my employment background, personal history, and other information which may be of a confidential or privileged nature. Is he not waiving confidentiality and Well, again, it goes to, you know, what he understood, and that, you know, seems to modify, you know, his work record. I'm trying to find the language that you're talking about with respect to confidential information, and that I see information of a privileged nature may be included. CR 180. Right, but yes, no, I'm there. I'm just trying to look at the language which says I further consent, you know, to Department of Revenue tax returns, etc., and it's the sentence above that, that information of a confidential nature may be included. I think the issue isn't really whether he saw those documents as privileged or confidential at the time. He just saw those as not within the scope of the release, because the scope of the release was clearly limited to finding information about his background and reputation with respect to these other areas, including his work record, and not just to that argument in mind on that point. So why don't we hear from, sure, and I'd like to reserve a little bit from the county. I didn't get into many of the other... You can't really reserve what you don't have, but you're kind of in the negative minus two here, but we'll work out something. May it please the court, I'm Doug Morrill, representing Pelley's in this matter, Snohomish County, and the individual defendants. I guess just a few points to kind of peeling the onion goes back from being effectively a contract case. It's primarily that. That was primarily the basis upon which Judge Zille ruled below. So primarily it's a release. It's a contractual release, which the county has stated in its briefing, believes is fully enforceable as a unilateral contract, or alternatively a third-party beneficiary contract. If for some reason that was not enforceable as a contract, and I can certainly get into the reasons why we believe it is, that's when we're going to the secondary arguments, which is consent. It's an absolute privilege, and down the line. It's not for me and the county. The novelty of this issue only comes if we get to those arguments down below, including that third-level argument, which is the qualified privilege. So in terms of certification to the Supreme Court, the Washington Supreme Court, that's the county's position is effectively this isn't particularly novel. This is a contract case. There's ample authority to decide it on that basis. Yes, if we're going down the line, yes, there is not a significant amount of any Washington authority with regard to absolute privilege in this context, but there is Ninth Circuit authority, and I'm sure you're well aware of that from the briefing, the Cox case, which is practically right on point. That's pretty persuasive authority at least for how this case should be decided in that basis. So from the county's perspective, it's argument is that we should decide it here today. It shouldn't be certified at Supreme Court. There's ample basis to do so before this circuit. With regard to some other of counsel's comments and some of the court's questions, I think, I guess, I just, I do need to point out, I think there are more issues than what counsel alluded to. There will be issues with regard to the falsity of the statements. There may be issues with regard to fault, unprivileged communication, and damages. I would not assume that that's the only thing that will be at issue in this litigation. Obviously, what we're looking at... I don't think she said that. Okay, I'm sorry. I'm just making clear for the record. From the county's perspective, if we're looking at this as a contract, it's plaintiff's burden to show the defenses to contract. And it's up to her to, or Mr. Lowen, to show what's wrong with it. From the county's perspective, this was not something it asked for. It's a third party that gets a release signed by a former employee, or not employee, a former applicant. Just to be sure there's clear understanding of that, the county didn't just put this out there. It responded to by the plaintiff here, right? Correct. And when the county got those requests, it looked at the authorizing documentation, such as the one we talked about of Indigo from Ellensburg, and read both the broad languages, and responded with the file, basically. Is that right? Correct. Exactly what it is. The releases, both releases here, were not anything the county typed up, made. These are things from the other entities, Kittitas County and Ellensburg. These are things that Mr. Lowen signed and provided to the county through the investigator for those entities. The county would not release this information but for those releases. It is, in effect, being hailed into this defamation lawsuit because of Mr. Lowen's own actions. Had he not sought employment there, this would never have come up, right? This was done in response to his request. Correct. The county was not actively trying to publish this information. Certainly, when it was defending its position in the civil service hearings, it was doing so. But it wasn't otherwise trying to reach out to other law enforcement agencies and communicate what had happened here. Does the record indicate whether, when it received the two requests, that any effort was made to parse through the file, or it's just simply the whole file and the whole record was turned over? I believe, yeah, I believe the pre-employment packet is turned over. And I think that includes the background investigation and his pre-polygraph questionnaire, if that makes sense. They're not turning over, you know, the details of the polygraph result, but there probably is in their notations that show what our polygraph result was, if that answers your question. Oh, they didn't turn over the polygraph? Not the polygraph itself, but there's notation in the documents that were looked at. Basically, they're very, I'm not sure where this is in the record, but I know it as a fact. The polygraph itself, you're talking about the graph? Yeah, it's digital nowadays, but it's, yes, that digitized information. In addition to that report or that printout, there's a narrative in English, right, the conclusion of the examiner. Right, they write up a report afterwards. That's what was turned over. I don't know that for a fact. I know there was notation indicating the results in the record that was reviewed by both of those entities. I don't know whether that actual report was what they looked at. Are such notes what people would look for when they wanted to determine the effect or the results of a polygraph? Yes, I believe Snohomish County did the exact same thing when it was looking at Mr. Lowen's background with other entities as well. Under normal practice, it wouldn't be the idea that some other polygraph person would look at this and be able to decipher it, like say a radiologist could decipher a photograph of somebody's broken limb. If one were to look at the actual polygraph, what happened in that polygraph, I believe they probably could. Okay, but the custom and practice is to look at the notes of the examiner. At least with Snohomish County, what they do is they provide this, the background investigation, which is a separate thing, so the things that meet their minimum quals are the polygraph, a medical eval, a polygraph. Sorry if I said that. Well, I assume at your position that, say, whoever the requester was, right, say if they wanted a follow-up document, if they phoned your personality department to say we'd like to see the polygraph report. I mean, you would consider it covered by the release, right, and give it to them, do you know? I would consider it covered by the release, but I think there would be some reluctance on behalf of the Sheriff's Office to provide that information because they want to maintain control of that sensitive process. They don't want people to be able to game a polygraph, so they're a little concerned about just turning that over. Maybe they might say you can come over to our office and look at it, maybe. Maybe, yes. I mean, it's more of a prudential thing as opposed to, is it covered by the release? I'd say it is covered by the release, and that's, I guess, moving on from that point is these releases are very broadly worded. Council made a point that Mr. Lowen's expectation was such that he thought it would not go to his prospective employers, only his former employers. I think the court has pointed out, and the county certainly agrees, there is no such limitation in the documents in the four corners of that agreement. So, any and all information you may have. Well, first of all, say like Ellen's work, wouldn't even know to go to Snohomish County unless the applicant told them, right, that I, you know, I applied for work at Snohomish County. How else would they know to contact the sheriff's office? That's probably true. I don't know that for a fact, but that's probably the case. Do you know how Snohomish County, how that issue, how it came up that Snohomish County would have information? Information about his prior polygraph, his Snohomish polygraph? Or anything. Well, when the county took over police services for Snohomish Police Department by the state statute, and it's in our briefs, we would be required to take anyone that met our minimum qualifications. Yeah. I'm asking you. How is it that Snohomish County is in a position of turning this stuff over? Just by virtue of their background investigators coming to Snohomish County, presenting the release, and saying, can we look at his information? And we have that information as a result of that hiring process, which is where I was going. You have the information. I'm just asking you, how it is you happen to be giving it out? Because of contact from another law enforcement agency. Law enforcement agencies then contacted Mr. Lieutenant Johnson. Right. And presumably they did that because Mr. Leon was seeking employment there and told them to go look for it, right? I presume, yes. Well, that was my question. I mean, it's an assumption, but you ask yourself, well, how else would they know to ask the county, right? Right. Sure. And I guess the thing I would point out... That's what happened. I know the county doesn't give this information out unless, one, there's a request, and the request is accompanied by a release. I mean, that's your policy, apparently. Correct. And actually, in the record, it is our policy. If you look at... I think the simple answer to your question might be taking a look at the evidence. Sure. It says, he met with... This is the Snohomish County, Lieutenant Johnson. He says he met with Detective Ingram from Ellensburg. He presented a notarized waiver, which is this, signed by Mr. Lohan, and a Troom Court copy is here. Then he says, on such and such a date, May, he met with Kittitas County Sheriff's Office. He also had a notarized waiver, and here's a Troom Court copy. I guess that's the answer to our question. Correct. Sorry, I didn't... I suppose I misunderstood where you guys were heading. That's the partial answer. Sure. It doesn't matter. That's how it got there. It doesn't answer why those people came to your office. Yeah, and I don't have an answer to that. I presume you're correct. It's because of that disclosure. So, from the county's perspective, just running, looking at my time a little bit, I think the important thing that county would like to emphasize is there will be a lot of discussion about policy with regard to the enforceability of this release. I think that's one of the defenses that is trying to be asserted in the briefing is, does it violate policy? And I think you've already heard it here today. I think plaintiff, appellant, is attempting to make this broader than it is. The specific context of this case is unique. It is law enforcement employment. It is not employment at large. Working at a fast food restaurant is not the same as being a police officer. There are state laws that govern the hiring process for police officers. There are state laws that govern the removal of police officers. It is a unique entity. The policy is such, and per common sense as well as state law, that we are to thoroughly vet law enforcement applicants. We've cited in the brief RCW 43-101-095. There's a state statute that says here's all the things thou shalt do. Okay, so tell me what, I understand all that, what relevance does it have to the claims? Just the relevance is it's a countervailing policy. If we're talking about this kind of release being a violative of public policy, I would say the public policy is the opposite effect. It is to thoroughly vet these applicants. It is to favor this kind of release so that law enforcement agencies do freely share this information. It is not unfair to the applicant for a few reasons. One is because you're always limited by the scope. In this case, in this case, as opposed to looking at all cases in general, in this case the scope was any information you have about me. There's no contention we provided more information than we had. We did not make something up. It was something that was already in our files and something that Mr. Lowen was already aware of. Our contention was made clear in these civil service hearings. So what is the, what is the county's position on whether the Mr. Lowen's counsel adequately, if you will, vetted these theories about policy at the district court level? Is this a surprise on appeal and to the extent, or was that for a thoroughly vetted? No, I would say the request for certification was made after the district court decision, but the motion, the arguments about policy, I don't think those were, those were argued below. I don't have an issue with that. The county does say, and it's a, it's a discretionary thing, I believe, but the county does have that, that issue, and it points it out in the brief that, that, that should have been made prior to the summary judgment decision, the request for certification. But I guess getting back to my point on the policy is, is the, the applicants are not without recourse. One is because of the scope of the release, they're always combined or confined by that, and two is they, they are civil service employees. They do have the right, if a background investigator has taken some other law enforcement agency's information at face value and didn't do their own investigation, they, that applicant can go to civil service and appeal that background investigator's, the work they have done. They can go to civil service and say this isn't fair. You have this completely false accusation from another entity, there is no basis for it, and challenge, you know, a subsequent entity's employment decision. So I take the, the argument on Kittitas County had to do with timing in that counsel says that her letter basically revokes the authorization, but I take it that the complaint there would be to Kittitas County, not to Snohomish County, because Snohomish County wouldn't have any knowledge of that, right? I don't believe it, if you look at the exchange between myself and Mr. Lowen's counsel, I think what you'll find is that she writes a letter that says you disclose stuff to Ellensburg that we think is not fair, not accurate. My response back to her was, here's everything we did, and it's exactly what you've heard today. We told you, we told that investigator this, he failed a poly and was hired by Snohomish. He failed our poly. That's not untrue at all, it's what Mr. Lowen told us. The, the close to this was, we've only told them truthful information and that's what we will continue to do if you effectively sign an authorization. And so when we get another authorization, that's what we do. I don't think you can read the two that we only ever agreed that we would do exactly what we had done with Ellensburg. We never took it as a revocation. Hearing no response from Mr. Lowen's counsel, when we get another release, we do the same thing we did before, and that's the gist. No, thank you. We let you go for quite a while, but you may want a minute rebuttal. Yes, I'd like to, I'd like to just respond to the whole question from the court, which I think is very central, which is how did they get this information? Again, there's nothing in the records to suggest that Mr. Lowen disclosed the events at Snohomish County to these prospective employers Ellensburg and Kittitas County at the time he made application. He wasn't asked about former, you know, there's no record that suggests that he was asked about former jobs that he had applied for. He was only asked about his work history, and for the, based on his work history, he was obviously ranked very high in their selection process. For both of them, he received conditional offers of employment. It was only after these disclosures by Snohomish County that his consideration for employment was withdrawn. So you're saying you have no idea, there's nothing in the record to suggest that he had disclosed his foray with Snohomish County? I mean, and therefore that was what led to the investigator going there? No, there's no evidence in the record to that effect at all. Does it matter? I think it does matter because, again, it's his position based on Washington law and the cases that the county's relying on that these kind of releases do extend to former employees. There's a common interest, there's a Washington state statute that's very clear about it that allows... Is there, to your knowledge, some central database they'd go to? Or were they just clairvoyant and they imagined he applied to Snohomish County? There's nothing that suggests... I don't believe there's any central database. There's nothing in the record that suggests that. The only thing, and again, he's speculating, I'm speculating, is there had been, you know, some press around the issues that had arisen with respect to picking up the city of Snohomish officers. You told him and you saw that he was having this hearing that might lead to following up? It's possible, but I would imagine at that point, you know, that the certain city of Snohomish officers had not been picked up by Snohomish County. Let me re-ask Judge McCune's question. What difference does it make how the request came to Snohomish County? I think it makes a difference, again, you know, in terms of the restatement states that it has, the consent has to mirror his intent and his understanding is determined, his intent is the disclosure. So, for example... Isn't it your burden to then put forth the circumstances that would affect the disclosure? Well, in this case, you know, there was no dispute as to the fact of the disclosure and so... Well, the circumstances that affected the disclosure, in other words, you know, how did Ellensburg find out about his application to Snohomish? Well, it was his understanding at the time... Not his understanding. You could have put in a declaration from your application to Snohomish. There's no declaration like that on the record, is there? There is not, but there is his understanding based on his vetting for that process that he had been screened, he had been preliminarily selected... His understanding is in the record? Well, that's undisputed, that he, you know, he passed their pre-employment qualifications and it was only on the chief's interview, which was the final step in that process in Ellensburg. Tell us what his understanding is. You're saying his understanding was that it would not, you know, it would not be disclosed? Well, he never expected, again... Is that in the record? Yes, his statement is in the record that he... That's what? I believe, I mean, I can gather that... His statement is that he didn't expect that a possible prospective employer would be contacted. Correct. And he's... If you go back to, well, does it matter... Well, I think it's a matter of, you know, common sense, you know, that a reasonable person knowing that they were in the course of a dispute with an entity would not disclose that they had an, you know, pending or prior application with that entity. And so, again... I would think the opposite, but then again, I'm not hiring for the police department. Well, you know, but that all respects that, you know... Of what they asked. Of what they asked him for. Is that in the record too, that that information was not solicited? Again, you know, there is no record about the specific circumstances of how... So we don't know whether it was solicited or not? We don't know, other than from Mr. Lowen. We do know, obviously, that it was solicited. And the issue is also, frankly, and I know I'm running out of time, is that it wasn't just, you know, there's a Ms. Johnson just provided the record for them to review. The issue is that she made the affirmative statement that he had failed two polygraphs without disclosing that he had subsequently, you know, you know, passed the entire examination process. And a polygraph is not a single entity, you know, single act. In fact, you know, their witness alone talks about the danger of using pass-fail language. And that's in Lee Malko's declaration, because it has the possibility of harming a person's consideration for employment, especially in a law enforcement context. Thank you. Thank you. Thank both counsel for your argument this morning. The case just argued of Leon versus Snohomish County is submitted and we're adjourned for the morning. Okay. All rise.
judges: Tashima, McKeown, M. Smith